## UNITED STATED DISTRICT COURT
## DISTRICT OF NEW JERSEY

BRANDON LAMONT BATTEE,

                              Plaintiff,

          v.

FIRST ENERGY CORP.,

                              Defendants.

Civil Action No.:

*(Filed Electronically)*

## <u>COMPLAINT</u>

## <u>JURY TRIAL DEMAND</u>

Plaintiff Brandon L. Battee ("Plaintiff" or "Mr. Battee"), by and through his attorneys, Dawkins & Warrington Law Group LLC, as and for his Complaint in this action against First Energy Corp. ("Defendants" or the "Company"), hereby alleges as follows:

## <u>NATURE OF THE CLAIM</u>

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his disability and its unlawful retaliation against him after he complained about unlawful discrimination in the workplace.

2.      This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et seq., as amended by the Civil Rights Act of 1991, at 42 U.S.C. §1981(a) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. ("ADA"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD").

**SUBJECT MATTER JURISDICTION AND VENUE**

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1391, as Plaintiff's claims are substantively based on Title VII and the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**ADMINISTRATIVE PROCEDURES**

5.      Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII.

6.      Plaintiff's EEOC charge arises out of many of the same facts alleged herein that pertain to his Title VII discrimination claim.

7.      On or about July 16, 2021, the EEOC completed its investigation of Plaintiff's charge and issued Plaintiff a Notice of Right to Sue and this action has been filed within ninety (90) days of receipt of said notice.

8.      Any and all prerequisites to the filing of this suit have been met.

**PARTIES AND PERSONAL JURISDICTION**

9.      Plaintiff, Brandon L. Battee ("Plaintiff" or "Mr. Battee"), is a thirty-four-year-old African American male.

10.     Defendant, First Energy Corp. ("Defendant"), is a corporation duly organized

and existing under the laws of the State of Ohio, maintaining a New Jersey headquarters at 300 Madison Avenue, Morristown, NJ 07960.

11.     At all times relevant hereto, the Defendant was acting through its agents, servants, and employees, who were acting within the scope of their authority, course of their employment, and under the direct control of the Defendant.

12.     At all times material herein, the Defendant is and has been a "person" and "employer" as defined under the ADA, Title VII, and NJLAD, and is accordingly subject to the provisions of each said act.

## FACTS

13.     In or about December of 2015, Plaintiff began working for Defendant as a Lineman.

14.     On or about December 9, 2018, began working as a Transmission Instructor but under the title "Distribution Instructor" and after eighteen (18) months in the position was offered and accepted the role of Advance Distribution Instructor in Defendant's Workforce Development group at its Phillipsburg location, which location has a physical address of 400 Lincoln Street, Phillipsburg, NJ 08865.

15.     On or about June 21, 2020, Plaintiff was promoted to the position of Advanced Distribution Instructor in Defendant's Workforce Development group at Defendant's Phillipsburg, NJ location.

16.     From the outset of Plaintiff's employment with the Company, Plaintiff was subjected to a pattern of inappropriate comments concerning his race and/or racial incidents, as well as derogatory comments regarding the race and ethnicity of other Company prospective hires.

*FirstEnergy Subjects Plaintiff to Adverse Employment Actions Via Frequent Drug Testing*

17.    Over the course of the approximate five (5) years of Plaintiff's time with the Company, Plaintiff was subjected to some fourteen (14) drug tests, several of which were invasive, however, all of which found Plaintiff to be negative for any drug use.

18.    Stated differently, notwithstanding abnormally high number of drug tests the Company subjected Plaintiff to, he never once failed a drug test.

19.    In the same amount of time, Plaintiff has endured consistent ridicule and race-based discrimination while working for the Company.

20.    On December 4, 2015, as is typical when starting a new job, Plaintiff was drug tested for the first time via urine sample analysis.

21.    On December 18, 2015, Plaintiff was drug tested for a second time.

22.    In March of 2017, the conditions of Plaintiff's workplace intensified when Plaintiff applied for the position of B-Lineman for the Youngstown, Salem, and North Jackson Line Shops.

23.    Following Plaintiff's application for the position of B-Lineman, Plaintiff was subjected to hyper-scrutiny and frequent drug testing.

24.    Plaintiff was discussed with his peers and superiors that he had unwittingly offended his superiors through his display of ambition by submitting his application for the B-Lineman position.

25.    Plaintiff's peers and superiors acknowledged that it was odd that he was being "randomly selected" for drug testing so often, but generally thought it was a "coincidence" that Plaintiff's drug testing came after he put in for a new position.

26.    Despite qualifying for the position, Plaintiff was denied the position.

27.     On March 23, 2017, Plaintiff was drug tested for a third time.

28.     At this point, Plaintiff began to become concerned about the frequency of his drug testing, however, he complied all the same.

29.     On April 5, 2017, Plaintiff, returning from a short personal vacation, was called into his supervisor's office, and required him to provide a fourth urine sample.

30.     Plaintiff was disturbed by the mandate because he had just submitted a third urine test.

31.     Plaintiff, nonetheless, complied with his supervisor's instructions.

32.     Also on April 5, 2017, Plaintiff's supervisor drove him to the urine testing facility and required Plaintiff to submit, for the first time, to an "observed" urine test.

33.     An "observed" drug test is a highly invasive form of drug testing that required Plaintiff to bring his shirt up to his chin and his lower garments down to his ankles, exposing his genitals for inspection of his penis and scrotum by a third-party, and urinating into a container to provide a specimen sample.

34.     Plaintiff objected to the "observed" test but was told by his superiors that the observed test was mandatory but provided no specific reason why when Plaintiff probed.

35.     When Plaintiff arrived at the testing facility and questioned the testing professional about what an "observed" test is and why he was being required to submit to it, the testing professional explained to Plaintiff that he did not know why he was being required to take an observed test.

36.     When Plaintiff further protested the "observed" test, the testing professional explained that if refused to have his test "observed" Plaintiff would be noted as having failed his test.

37.     Plaintiff, upset by the entire ordeal, requested to call his union steward, who told Plaintiff he had to do what the testing facility asked. Plaintiff was taken aback by the process, as he found the circumstance to be invasive and because there was no forewarning.

38.     Plaintiff reports felt violated by the ordeal and called his father, also a longtime employee of the Company, because he was scared and did not understand why he was being subjected to such frequent and "observed" drug testing.

39.     Plaintiff's father recommended he contact the Company's Human Resources (HR) department, which HR department informed Plaintiff that his fourth urine test "was considered invalid" because Plaintiff's PH levels "were off".

40.     On or about April 11, 2017, approximately one (1) week following Plaintiff's first "observed" drug test, Plaintiff's supervisor pulled him off a jobsite to provide a fifth urine sample.

41.     The spectacle of being pulled from a worksite for drug testing, and being subjected to such frequent drug testing, resulted in Plaintiff's colleagues gossiping and ridiculing him.  To the point, Plaintiff's colleagues on the Ravenna/Akron crew (approx. 30miles away), Massillon crew (approx. 55miles away), Mansfield crew (approx. 117 miles away) spoke to Plaintiff about what was happening to him.

42.     On the same date, Plaintiff called the Company human resources department and was told that his third urine sample had resulted in a finding of "Negative Dilute", and the Department of Transportation ("DOT") required him to submit to his fifth test.

43.     A "Negative Dilute" drug test result means the donor consumed a larger quantity of water prior to providing the urine specimen. This is a common test result, as many individuals consume water for health reasons and/or because of a fear of not being

able to urinate at the time of the drug test specimen collection.

44.     Plaintiff began to feel upset that the process was placing him in a negative light with his crew and supervisors, as he values deeply his reputation and "family name" and felt the banter from his crew and superiors had the effect of tarnishing his good name.

45.     As time progressed, Plaintiff was subjected to consistent ridicule by his crew members and began to feel he was being specifically targeted by his superiors for frequent drug testing.

46.     To the point, speaking with his peers Plaintiff learned that no one else aside from him was being drug tested from his crew.  This realization was hard on Plaintiff, as he had witnessed others on his crew that engaged in heavy drinking and recreational drug consumption though he did not partake in those activities.

47.     For a period of time, Plaintiff was teased by his colleagues with comments, such as, "I can go home and smoke this joint because Battee is the only one of us being tested"; "I['m not worried about any testing[;] the C-Tard is the only one being tested" ("C-Tard" is a pejorative play on the offensive word "retard"); and, Plaintiff's Transmission Department's manager, Robert Frazier, laughingly would say, "[Y]ou're up again…You should play the lotto."

48.     Plaintiff was also told by his superiors and/or individuals with more tenure in the union to "Go back to Monkey Rock."

49.     Plaintiff's crew and superiors' ribbing took a toll on him, resulting in symptoms of anxiety and depression for which Plaintiff has been in consistent treatment with his therapist.

50.     On May 15, 2018, Plaintiff was required to take his sixth "random" drug test.

51.     On July 17, 2018, Plaintiff was required to take his seventh "random" drug test.

52.     On September 19, 2018, Plaintiff was required to take his eighth "random" drug test.

53.     Following his eighth drug test, Plaintiff reached out to the Company's HR department and expressed that he felt the entire drug testing circumstance felt "off" and that he felt he needed to contact an attorney.

54.     Thereafter, the Company's frequent "random" drug testing stopped for a significant period of time, until December of 2020.

55.     On December 9, 2020, Plaintiff was informed that he needed to take his nineth "random" drug test.

56.     Plaintiff's nineth drug test results suggested Plaintiff's sample was adulterated (or watered down).

57.     Plaintiff found the timing of the drug test suspect, as it came on the heels of Plaintiff's superior, David Carder, submitting a complaint to the Company's HR department concerning his observation of a racist incident involving two of Plaintiff's trainees calling him a racial slur.

58.     Indeed, following the filing of his complaint to HR on Plaintiff's behalf, Mr. Carder was also "randomly" selected for drug testing at this time, demonstrating a lack of randomness in the drug testing selection process.

59.     On December 16, 2020, Plaintiff received from the Company a notice of "Violation Information", which showed the results of his December 9, 2020, ninth "random" drug test as "Drug test refusal" for the stated reason that his sample was "Adulterated".

60.     The next day, on December 17, 2020, Plaintiff received correspondence from the Company's HR representative, Laura Nedelk-Stallings, which stated that Plaintiff may make a request for a test of his "split specimen".

61.     Ms. Nedelk- Stallings went on to explain that if Plaintiff "misses this window, we'll need to move forward with the 10 day [sic] suspension to comply with internal HR policy."

62.     The end of December is typically a markedly difficult time to schedule drug testing due, in part, to companies' holiday schedules, but scheduling was further complicated by the proliferation of the COVID-19 pandemic.

63.     Notwithstanding the fact that Plaintiff did not (and had never) failed a drug test, on December 22, 2020, Plaintiff received a written violation notice from the Company regarding the results of his drug tests, in which the Company suspended Plaintiff and subjected him to various onerous requirements in order to be allowed to return to work.

64.     The due process afforded to Plaintiff was substantially lacking, as Plaintiff has never failed a drug test (because Plaintiff does not make use of recreational drugs) but was suspended as if he had failed a drug test.

65.     Accordingly, Plaintiff began to believe he was simply being targeted to be pushed out of the Company.

66.     On December 23, 2020, Plaintiff sent correspondence to the HR department requesting all documentation in his employee file concerning his past drug tests.

67.     On December 28, 2020, Plaintiff informed his superior, Michael Atherly, that he had scheduled his next drug testing appointment (for his tenth urine tests) for January 7, 2021.

68.     Plaintiff also shared with Mr. Atherly that he scheduled an appointment get a hair sample drug test because of his previous tests coming back marked as adulterated. Plaintiff also shared this information with the Company's Human Resources Representative, Tamara Williams.

69.     Plaintiff also told to Mr. Atherly that he was being assigned a "SAP" or "Substance Abuse Professional" that was requiring him to do additional steps, and would not be allowed to return to work until he completes an ad hoc SAP program.

70.     Plaintiff further expressed to Mr. Atherly concerns about whether his pay would be stopped based on the ad hoc SAP process required for his return; however, at the time, Mr. Atherly was unable to answer Plaintiff's inquiries.

71.     On or about December 30, 2020, Plaintiff went for his SAP evaluation and was awaiting a final approval to return to work and shared this information with his superior, Mr. Atherly.

72.     On January 6, 2021, Plaintiff reached out to Mr. Atherly, to request information on when his 10-day suspension was meant to end.

73.     On January 7, 2021, Plaintiff had an eleventh drug screen taken based on Ms. Williams', the Company's Human Resources Representative's instruction.  Plaintiff was told to get a drug screen, so he scheduled an appointment with a family doctor expedite the drug screening process to get back to work. Due to a labeling issue with by the family doctor's office, the lab refused to test Plaintiff's sample and Plaintiff was forced to share a voicemail from the family doctor's office proving that they had taken responsibility for the confusion.

74.     On January 9, 2021, Plaintiff proceeded to get an independent hair follicle

drug test conducted, resulting in Plaintiff's twelfth drug test.

75.     On January 11, 2021 Plaintiff received the results of his negative hair follicle test via email from the testing facility.   Plaintiff immediately called to confirm results and to have the testing facility email the results to him because the Company's HR representatives questioned Plaintiff on the validity of the hair follicle drug test.

76.     On January 12, 2021, the Company required Plaintiff take his thirteenth drug test, which was also an "observed" drug test.

77.     On the same date, Plaintiff was observed by Eric Smith, LPN from Toxicology Enterprises for a urinalysis test.

78.      The results of Plaintiff's twelfth drug test showed that he was negative for any proscribed substances.

79.     On January 18, 2021, Eric Smith, LPN contacted Plaintiff with the negative results of his urine test and sent confirmation of his results via email.  Thereafter, Plaintiff contacted Mr. Atherly and requested clarification on who was responsible for making the decision to allow him to return to work but was unable to get from Mr. Atherly the requested clarity.

80.     On January 19, 2021, Plaintiff was required to take his fourteenth "random" drug test.

81.     At this point, Plaintiff had become exasperated with the Company's drug testing process and reached out Mr. Atherly via text message, explaining, "This is crazy so, I'm at a hospital getting tested.  I've been in this waiting room for over 25 mins waiting in the same room with people displaying signs of freaking Covid. So[,] this test is that important that they are going to put my health at risk for it?  Why didn't they send me to a

drug test center like Quest?"  Unfortunately, Plaintiff was forced to wait approximately 45 minutes with a full bladder as the testing facility scrambled to find an available male to observe Plaintiff's urine test, which resulted in Plaintiff urinating on himself.

82.     On the same date, Plaintiff and Mr. Atherly exchange a variety of correspondences in which the two express frustration and confusion about why Plaintiff was being put through such a cumbersome process.

83.     It was also on this date that the Company's HR department, responding to Plaintiff's outreach concerning his frequent drug testing, explained for the first time to Plaintiff that there exists a process for challenging his drug test results.

84.     However, by the time Plaintiff was informed of the process for challenging his test result, he had an unreasonably small window to do so.

85.     Between January 20-29, 2021, Plaintiff and the Company's HR department exchanged various correspondences concerning his drug testing and status with the Company.

86.     Plaintiff consistently requested information on where he was in the process and what proofs were necessary to clear his name with the Company.

87.     On January 29, 2021, Plaintiff updated Mr. Atherly concerning Plaintiff's attempts to complete his fifteenth drug test.  The test was required by the Company and there were a series of blood and urine samples taken from Plaintiff for testing.

88.     Unfortunately, on February 2, 2021, Plaintiff's appointment for his urinalysis and blood drug test was cancelled due to inclement weather.

89.     On the same date, the Company's HR department informed Plaintiff that he had until February 13, 2021 to complete his fifteenth drug test.  The Company's HR

department explained that this February 13, 2021 date given as a date-by-which Plaintiff could have challenged the ruling from the Company with a medical reason for his PH Levels being other than normal.

90.      Importantly, the entire drug testing ordeal caused Plaintiff deep anxiety, so Plaintiff went the doctors to give blood to see about his health, because he began to believe his urine samples might be evidence of a more serious health condition.

91.      To the point, Plaintiff updated Mr. Atherly via text message about his recent urine test, explaining, "So I just left the doctor. He doesn't know what the cause could be for the lower ph level. My white blood count is extremely high, my vitamin B and D are extremely low.  He is sending me to a blood specialist to see what's going on.  He definitely want to help me but can't speculate. He also said if we had more time that would have helped.  He also questioned why the MRO can't tell me what was in the sample.  I'm just gonna [sic] go to this specialist and go on about my life. Hopefully it['] s not leukemia."

92.      On February 15, 2021, Plaintiff exchanged correspondences with the Company's HR department concerning the Company's requirement that Plaintiff "consult with the ODAPC (Office of Drug and Alcohol Policy and Compliance) prior to changing the result."

93.      HR's email further provided that Plaintiff "may provide a legitimate medical explanation after the 60 day period, but I'm guessing the process could take a while.  This does not impact our obligation to comply with the SAP's follow-up program and there will be no suspension of this regulatory requirement."

*FirstEnergy's Subjects Complainant to a Hostile Work Environment*

94.      In or about March/April of 2016, Plaintiff was approached by a colleague

assigned with him on a "Bluebell job".

95.     Plaintiff's colleagues described that a supervisor/manager on their job had purposefully grabbed his colleague's genitals.  Plaintiff believes his colleague shared this information with him because the two were close—Plaintiff and his colleague shared common interests and Plaintiff's colleague was raised a diverse neighborhood. The pair were often the targets of ridicule and shunning.

96.     Plaintiff expressed to his colleague that he should report the incident to the Company's HR department; however, his colleague afraid to do so because the two were still being observed in a 90-day probationary period with the Company and twelve (12) month probationary period with the union.

97.     Upon information and belief, the incident was reported and quickly investigated by the Company, but nothing resulted from the incident being reported.

98.     Indeed, upon information and belief, the supervisor/manager implicated in the genital-grabbing incident was later promoted and/or elevated in title.

99.     On July 8, 2020, Plaintiff had recently begun his present assignment as a an Instructor for the Company's internal training school.

100.     Plaintiff experienced an early instance of uneasiness with racial tension when, on the same date, Plaintiff met one of the Company's managers, James Mauro, who had mistaken Plaintiff for his superior, Mr. Carder.

101.     Plaintiff observed Mr. Mauro staring at him with disdain on occasion.

102.     On August 18, 2020, Plaintiff participated in a call for the Pre-Apprenticeship Program ("PSI")—a program that seeks to bring in new linemen and substation specialist in partnership with local nonprofit organizations.

103.    During the August 18, 2020 PSI call, Plaintiff expressed his feeling that he and his would-be students of color were being discriminated against.

104.    Plaintiff felt he had to "go to bat" for two African American PSI program participants, as he understood both participants to meet and exceed the Company's hiring criteria but were put on a "do not hire" list.

105.    On August 24, 2020, Plaintiff encountered systemic discrimination within the Company's hiring process when the Company's union arrived and required three (3) diverse candidates be placed on a "do not hire list" after only a few hours of observation.

106.    Plaintiff made several attempts to push back on the union's decision to place the diverse candidates on the "do not hire list" but was ignored.

107.    After two weeks of training with the candidates in question, Plaintiff was confident in their ability to move on in the process and succeed in the hiring process.

108.    Again, Mr. Mauro arrived on the scene and purposefully refused to shake Plaintiff's hand, though he was willing to shake everyone else's hand from the union when entering Plaintiff's classroom.

109.    Plaintiff felt deflated by the experience and understood his race to be, at least in part, why he was being treated differently and refused the courtesy of acknowledgment or a simple handshake.

110.    In or about early-September of 2020, Mr. Mauro again arrived at Plaintiff's classroom and refused to shake Plaintiff's hand.

111.    This time, Mr. Mauro did this in front of Plaintiff's entire class, many of whom noticed and talked about the incident after the fact.

112.    On October 27, 2020, Plaintiff was visited by Mr. Carder, his superior, who

advised that he has overheard two Company employees stating that they would not come back to training because of "that fucking nigger in New Jersey".

113.    Upon information and belief, Plaintiff was the only person of color in his position in the Company in New Jersey.

114.    Plaintiff learned from Mr. Carder that Mr. Carder was going to make a report of the incident to the Company's HR department.

115.    On or about March 23, 2021, Plaintiff was approached by one of his student trainees and informed about an incident of racial discrimination that transpired during class.

116.    The student reported that one of his peers had inappropriately brandished a pocketknife that had emblazoned on its handle a confederate flag with the phrase, "The South will rise again."

117.    The reporting student engaged his peer holding the pocketknife about whether he believed in the confederate flag and phrase on his pocketknife, to which the student's peer admitted he and his entre family did.

118.    The reporting student also explained that his peer with the pocketknife confirmed that he had family that worked for the Company and that sat on the program's selection committee.

119.    Plaintiff's student further reported that his peers in his training class had also tied nooses during knot tying exercises.  The report student explained to Plaintiff that such incidents offended and worried the student about his safety and status with the Company.

120.    Plaintiff heard his student's complaint and assured him he would share with the appropriate personnel to have the matter addressed.

121.    Later that evening, prior to Plaintiff reaching his home following his

commute, the reporting student sent to Plaintiff an email outlining what had transpired and expressing concern that he would be retaliated against for having made his reporting the discriminatory incidents to Plaintiff.

122.    Immediately upon receiving the email correspondence form his student, Plaintiff forwarded the email to his superior Atherly.

123.    This instance of hostile work environment left Plaintiff feeling helpless and unsupported by the Company.

124.    Indeed, the Company immediately called into question Plaintiff's judgement regarding his sending of his reporting student's email up the chain of command.

125.    Upon information and belief, the Company ultimately expelled the student in question from the PSI program, but not until admonishing Plaintiff for his handling of the situation.

*FirstEnergy Ignores Plaintiff's Outreach for Support & Plaintiff's Deteriorating Mental Health*

126.    On January 25, 2021, Plaintiff began seeing his treating therapist, Dr. Adisa Alghali.

127.    Dr. Alghali diagnosed Plaintiff with "Adjustment disorder with mixed anxiety and depressed mood".  *See* correspondence from Dr. Adisa Alghali, here attached as **Exhibit A**.

128.    Plaintiff has been in treatment with Dr. Alghali weekly since January 25, 2021, specifically for issues brought on by negative experiences Plaintiff had and continues to have with the Company.

129.    Working with his treating therapist, Plaintiff has attempted to seek support and guidance from friends and family to cope with his circumstances.

130.    Plaintiff has also sought to garner the guidance and support of leaders internal to the Company.

131.    On February 17, 2021, Plaintiff reached out to the Company's Director of Workforce Development to get her perspective on his drug testing issue.

132.    Concerned about his long-term career prospects with the Company, Plaintiff reached out to the Director desiring "to keep the conversation as a personal call. [He] didn't want to make the conversation a business call."

133.    Plaintiff learned from the Director that she was unaware of the fact that Plaintiff voluntarily gave a hair sample nor that the test came back negative.

134.    The Director also assured Plaintiff that HR does not coordinate directly with other entities, such as the union.

135.    Plaintiff broached with the Director that Mr. Carder put in a complaint about union members to the Company's HR department and Plaintiff and Mr. Carder were both drug tested shortly thereafter.  The Director, however, suggested the incident was a function of coincidence.

136.    On February 18, 2021, Plaintiff received a call from his superiors, James Kasinecz, General Supervisor of Work Force Development, and Timothy Washington, Manager of Workforce Development, in which Plaintiff explained that circumstances like his has caused a chilling effect within the Company that makes it so employees "rarely want to go to HR with complaints."

137.    Plaintiff further discussed all of his unsavory experiences since joining the Company and broached the fact that even though he was forced to take fourteen (14) drug tests that all came back "clean", he also secured a hair sample drug test that also showed he

did not take drugs but his hair test too was rejected by the Company.

138.    During the call, Plaintiff learned from Mr. Kasinecz and Mr. Washington that he had 60 days to contest his urine test results for the first time, though the pair were unable to speak specifically to the process for contesting the urine test results.

139.    On February 19, 2021, Plaintiff was experiencing deep anxiety as he received word from his superiors that they would like to meet with him again.

140.    Plaintiff soon learned the meeting was set to discuss Plaintiff being required to take frequent urine tests by the Company.

141.    In the meeting, Mr. Washington explained that Plaintiff would be required to undergo additional drug testing for another next year from the date of Plaintiff's last return-to-work drug test.

142.    Plaintiff responded that he had taken his return-to-work drug test after he had already been back to work for over a week.

143.    Plaintiff was informed by Mr. Washington that in the next year he would have to take six (6) additional drug tests.

144.    Plaintiff shared with his superiors his understanding that the six (6) tests they mention are the minimum number of tests he would be required to take under the Company's policies.

145.    Plaintiff also informed his superiors that he has been placed by the Company into two (2) separate drug testing pools – a "special one and the regular DOT pool".

146.    Plaintiff's superiors expressed that they were unaware that Plaintiff was in two "random" drug test selection pools.

147.    Mr. Washington told Plaintiff that he "can request to have the regular DOT

test observed" to address the issue; however, Plaintiff did not desire to have another invasive, observed drug test.

148.   Correcting his superiors, Plaintiff explained that "[i]t is not DOT policy to let anyone request to be watched during a drug screen unless it was requested by the DOT[,] and they only do that for situations like I'm in now."

149.   Plaintiff then asked his superiors, concerning his desire to have the tests halted, "If this is the case, how do I protect myself if this happens again?  I won['｣t be able to[.]  [F]rom that paperwork I received if this happens again, I would be most likely fired."

150.   In response, Mr. Washington, seemingly attempting to minimize Plaintiff's stated issues, told Plaintiff a story about Mr. Washington several times in one year.

151.   No tangible assistance was offered to Plaintiff despite his attempts to seek support from the Company's upper management.

*FirstEnergy Refuses to Grant Plaintiff's Request for a Reasonable Accommodation*

152.   In or about March of 2021, Plaintiff was undergoing weekly treatment with his therapist, which therapist recommended and ultimately prescribed that he obtains a service animal to assist Plaintiff with his anxiety while at work.

153.   Between March and early-April of 2021, having alerted Mr. Atherly of his intent to bring his support animal to work with him, Plaintiff began bringing his service animal to work daily.

154.   In or about early April of 2021, Plaintiff was anonymously reported to the Company's HR department for having his service pet on the Company's premises and Plaintiff was called by HR and admonished for having his service animal with him at work.

155.   Plaintiff was ultimately told he could not bring his service animal to work.

156.     Upon information and belief, other individuals that work for the Company had brought their dogs to work without preclearance and without incident.

157.     On or about April 22, 2021, Plaintiff requested, and Mr. Atherly provided, a copy of the Company's policy entitled "Service Animals in the Workplace Guidelines for Human Resources" (hereinafter, the "Service Animal Policy"). *See* a true and accurate copy of the Company's "Service Animal Policy" here attached as **Exhibit B**.

158.     On May 16, 2021, Plaintiff sent correspondence to HR Representative, Tamara Williams, formally requesting "a reasonable accommodation to bring his [service animal] to the training facility", explaining that "My stress level has increased again and it's taking a toll on me mentally and physically." Plaintiff further described that "It's hard to concentrate and I have had three (3) anxiety attacks this past work week. I have also found myself very emotional having to walk away from my class a few times due to uncontrollable weeping."

159.     On May 17, 2021, Ms. Williams responded to Plaintiff, stating, "I will be in contact with you over the next few days to discuss your needs."

160.     On May 28, 2021, Plaintiff contacted Ms. Williams to let her know that his paperwork was officially for seeking the support of his service animal. Ms. Williams was aware that Plaintiff was awaiting the paperwork stating his dog was a service animal.

161.     On May 26, 2021, Plaintiff followed up with Ms. Williams regarding his request for a reasonable accommodation and provided a prescription for his service animal from Plaintiff's treating Advanced Practice Psychiatric Mental Health Nurse Practitioner, JoAnne Piaggio. *See* a true and accurate copy of the prescription from JoAnne Piaggio here attached as **Exhibit C**.

162.    On June 4, 2021, Ms. Williams sent Plaintiff correspondence requesting proof of Plaintiff's service animal having been trained and certified as such, as well as listing a variety of questions about Plaintiff's specific symptoms and an itinerary of Plaintiff's service animal's training.  Plaintiff complied with Ms. Williams' request, providing documentation of his dog's service animal status.

163.    On the same date, Plaintiff responded to Ms. Williams objecting to the depth of her inquiries and noted that requiring such proofs runs afoul of the law.

164.    On June 15, 2021, Plaintiff again followed up with Ms. Williams regarding his request for a reasonable accommodation, noting that he has been forced to leave his service animal at his apartment, which was causing issues was frustrating his relationship with his property management that had allowed him to keep his dog on premises as an exception to the proscription to have pets contained in his lease agreement.

165.    On June 16, 2021, Ms. Williams sent correspondence to Plaintiff again requesting that he forward a certification that his service animal had completed training and asking additional questions about the sufficiency of Plaintiff's service animal's training process.

166.    On the same date, Plaintiff responded providing additional information regarding his service animal's training, as well as objecting to Ms. William's request for proof of training records.  Indeed, Ms. Williams asked for Plaintiff's proof that such information could not be requested by an employer, to which Plaintiff provided several links from government and other web-based sources.  Ms. Williams stated she would forward the links "to legal to get a better understanding."

167.    On June 17, 2021, Plaintiff sent correspondence to Ms. Williams objecting to

her statement that "there may be need to request medical review of your condition", and instead proffered that he would share any information required about his service animal, but would not sign a medical waiver so that the Company would have "permission to discuss anything in [Plaintiff's] medical file."

168.    To date, the Company has failed to response to his request for a reasonable accommodation.

## COUNT ONE
### (Title VII – Race Discrimination, Hostile Work Environment)

169.    Plaintiff incorporates by reference paragraphs 1 through 168 as though fully set forth at length herein.

170.    Defendant subjected Plaintiff to a hostile working environment and discrimination based on his race, as detailed above.

171.    The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious statements made by numerous employees expressing animus towards Plaintiff's race, the constant and unwavering harassment and derogatory comments towards Plaintiff based on his race, and Defendant's blatant denial of Plaintiff's workplace rights because of his race.

172.    Plaintiff considered the aforementioned conduct to be discriminatory, and reported said discriminatory conduct, both verbally and in writing, to numerous management level employees of Defendant, including, but not limited to, Mr. Atherly, Mr. Washington, and Mr. Carder.

173.    Accordingly, Defendant was fully aware of the hostile work environment. However, despite Plaintiff's numerous complaints of discrimination, Defendant failed to conduct an investigation or otherwise cause the discriminatory conduct to cease.

174.     Rather than cause the discriminatory conduct to cease, Defendant retaliated against Plaintiff by targeting him for frequent drug testing, allegedly based on "random" selection.  However, Defendant's reason for Plaintiff's frequent drug testing is pretextual, and he was actually being targeted for frequent drug testing in an effort to push Plaintiff out of the Company for attempting to advance his workplace rights.

175.     Accordingly, Defendant's discriminatory acts have deprived Plaintiff of equal employment opportunities because of his race in violation of Title VII.

176.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff sustained permanent and irreparable harm, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

177.     As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT TWO
### (Title VII – Retaliation)

178.     Plaintiff incorporates by reference paragraphs 1 through 177 as though fully set forth at length herein.

179.     The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff to retaliation for opposing unlawful discrimination in the workplace, constituted a violation of Title VII.

180.     Defendant subjected Plaintiff to frequent drug testing and suspended

Plaintiff's employment in retaliation for registering numerous complaints of discrimination in the workplace.

181.    The reason articulated for Plaintiff frequent drug testing and suspension is pretextual, and Defendant's adverse employment actions were actually in retaliation for Plaintiff opposing unlawful discrimination in the workplace.

182.    As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendant in violation of Title VII, Plaintiff sustained permanent and irreparable harm, resulting in the loss of his employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

183.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT THREE
### (NJLAD – Race Discrimination, Hostile Work Environment)

184.    Plaintiff incorporates by reference paragraphs 1 through 183 as though fully set forth at length herein.

185.    Defendant subjected Plaintiff to a hostile working environment and discrimination based on his race, as detailed above.

186.    The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious statements made by numerous employees expressing animus towards Plaintiff's race, the constant and unwavering harassment and derogatory comments towards Plaintiff based on his race, and Defendant's blatant denial of Plaintiff's

workplace rights because of his race.

187.     Plaintiff considered the aforementioned conduct to be discriminatory, and reported said discriminatory conduct, both verbally and in writing, to numerous management level employees of Defendant, including, but not limited to, Mr. Atherly, Mr. Washington, and Mr. Carder.

188.     Accordingly, Defendant was fully aware of the hostile work environment. However, despite Plaintiff's numerous complaints of discrimination, Defendant failed to conduct an investigation or otherwise cause the discriminatory conduct to cease.

189.     Rather than cause the discriminatory conduct to cease, Defendant retaliated against Plaintiff by targeting him for frequent drug testing, allegedly based on "random" selection.  However, Defendant's reason for Plaintiff's frequent drug testing is pretextual, and he was actually being targeted for frequent drug testing in an effort to push Plaintiff out of the Company for attempting to advance his workplace rights.

190.     Accordingly, Defendant's discriminatory acts have deprived Plaintiff of equal employment opportunities because of his race in violation of the NJLAD.

191.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

192.     As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT FOUR
### (NJLAD – Retaliation)

193.    Plaintiff incorporates by reference paragraphs 1 through 192 as though fully set forth at length herein.

194.    The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff to retaliation for opposing unlawful discrimination in the workplace, constituted a violation of the NJLAD.

195.    Defendant subjected Plaintiff to frequent drug testing and suspended Plaintiff's employment in retaliation for registering numerous complaints of discrimination in the workplace.

196.    The reason articulated for Plaintiff frequent drug testing and suspension is pretextual, and Defendant's adverse employment actions were actually in retaliation for Plaintiff opposing unlawful discrimination in the workplace.

197.    As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendant in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm, resulting in the loss of his employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

198.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT FIVE
### (ADA – Disability Discrimination, Failure to Accommodate)

199.    Plaintiff incorporates by reference paragraphs 1 through 198 as though fully

set forth at length herein.

200.    The actions of the Defendant, through its agents, servants and employees, in discriminating against Plaintiff on the basis of his actual and/or perceived disabilities and/or record of impairment, and failing to provide reasonable accommodation for his disability, constituted violations of the ADA.

201.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff sustained permanent and irreparable harm, resulting in his suspension from employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

202.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

### COUNT SIX
**(ADA – Retaliation)**

203.    Plaintiff incorporates by reference paragraphs 1 through 202 as though fully set forth at length herein.

204.    The actions of the Defendant, through its agents, servants and employees, in retaliating against Plaintiff for requesting a reasonable accommodation, and for opposing unlawful disability discrimination in the workplace, constituted a violation of the ADA.

205.    As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff sustained permanent and irreparable harm resulting in the suspension of his employment, which caused him to sustain

a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

206.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT SEVEN
### (NJLAD – Disability Discrimination, Failure to Accommodate)

207.    Plaintiff incorporates by reference paragraphs 1 through 206 as though fully set forth at length herein.

208.    The actions of the Defendant, through its agents, servants and employees, in retaliating against Plaintiff for requesting a reasonable accommodation, and for opposing unlawful disability discrimination in the workplace, constituted a violation of the NJLAD.

209.    As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm resulting in the suspension of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

210.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT EIGHT
### (NJLAD – Retaliation)

211.    Plaintiff incorporates by reference paragraphs 1 through 210 as though fully

set forth at length herein.

212.    The actions of the Defendant, through its agents, servants and employees, in retaliating against Plaintiff for requesting a reasonable accommodation, and for opposing unlawful disability discrimination in the workplace, constituted a violation of the NJLAD.

213.    As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm resulting in the suspension of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

214.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## **PRAYER FOR RELIF**

215.    Plaintiff incorporates by reference Paragraphs 1 through 214 of his Complaint as though fully set forth at length herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against the Defendant, and order that:

a.    Defendant compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination.

b.    Defendant compensate Plaintiff with an award of front pay, if appropriate;

c.    Defendant pay to Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of

life and other nonpecuniary losses as allowable;

    d.    Defendant pay to Plaintiff, pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

    e.    The Court award such other relief as is deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 29, 2021

**DAWKINS & WARRINGTON LAW GROUP**

 /s/ Clifford D. Dawkins, Jr.
Clifford D. Dawkins, Esq. (ID. NO.: 164792015)
239 New Road, Suite B205
Parsippany, NJ 07054
T: (201) 919-5458
Cliff@DawkinsWarrington.com
*Attorneys for Plaintiff*

## <u>VERIF'ICATION</u>

I, BRANDON L. BATTEE, of appropriate age and sound mind hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are made subject to the penalties relating to unsworn falsification to authorities.

Date ___9/28/21___

_____
BRANDON LAMONT BATTEE, Plaintiff